**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

DEREK J. HARPER,                    )
                                    )
                Petitioner,         )
                                    )
        v.                          )        1:09CV736
                                    )
ALVIN W. KELLER, JR.,               )
                                    )
                Respondent.         )

<u>**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**</u>

**I. Introduction**

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket Entry 6.)  The Petition relates to convictions entered and sentences imposed on April 17, 2007, by Judge Henry E. Frye, Jr. in the Superior Court of Guilford County, after Petitioner pleaded guilty to eight counts of robbery with a dangerous weapon and one count of attempted robbery with a dangerous weapon in cases 06 CRS 83887, -84135, -84137, -84138, -84139, -84140, -84142, -84144, and -24025. (Docket Entry 10 Exs. 3, 4.)  Each of the offenses (which arose from nine different indictments that charged Petitioner with robbing – or in one case attempting to rob – nine different individuals on May 15, 2006) qualified as Class D felonies under North Carolina law. (<u>Id.</u>; Docket Entry 6-4 at 9-17.)  Petitioner's plea agreement limited his sentencing exposure to that applicable to two (rather than nine) Class D felonies, otherwise left sentencing to the court's discretion, and provided for the activation of a prior suspended state sentence of 23 to 37 months

for felony assault to run concurrently with the robbery sentences. (Docket Entry 10 Ex. 3 at 3, Ex. 12 at 20.)

At the time of his guilty plea, Petitioner "consent[ed] to a summarization of the evidence relating to the factual basis" (Docket Entry 10 Ex. 12 at 6) and the prosecutor provided the following description of the offense conduct:

> [O]n May 15th, [2006,] at around midnight, there were a number of people inside [the Corner Bar in Greensboro], probably more than ten . . . .
>
> And two armed, masked men came through the door and walked up to the victims and in a loud and profane way demanded that they all get on the ground. They just basically took over the place.
>
> . . . [O]ne of the [masked men] approached [the bartender] and made him go get the money and took the business's money. . . .
>
> . . . [T]he [masked men] laid [the bar patrons] out on the floor and went down one at a time and took their jewelry, wallets, money, whatever they had, pocketbooks.
>
> The two [masked men] -- one was armed with a semiautomatic handgun and the other was armed with what appeared to be a revolver, a silver revolver.
>
> After they committed the robbery inside, [the masked men] left out of the business.
>
> When the police got there [the bartender] told the police that, "Well, you can't get in here without a key. It's a membership club. I keep a key outside for the members who forget their key, or whatever. They know where it is and they just use the key that's under the rail outside to come in." And he said that key is now missing.
>
> [The bartender] also told the officer that there was an individual -- he called him Buddha -- but his name was Butler, who had come in just prior to the robbery and gone to the restroom and then left out without speaking to anybody, and [the bartender] thought this was curious . . . .

The police continued with their investigation and eventually they got a Crime Stoppers tip as to who had committed this crime, and one of the names was this Butler individual who had been seen coming in the bar just prior to the robbery that night.

And [the police] went and interviewed [Mr. Butler] and really didn't get anything out of him.

[The police] also got the name of [Petitioner] from this Crime Stoppers tip, and they didn't get anything out of him either as far as information, but they did find in his vehicle . . . a paint ball mask, and that was significant because one of these tall individuals who had come in the business -- one of the two -- had a paint ball mask on his face. They didn't find any paint ball guns, they didn't find anything like that, but they did find the mask itself. . . .

[Petitioner] was charged with these offenses.

Eventually the police interviewed a man named Clifton . . . who gave them a statement and admitted he was driving the car. And he said the people that were with him were Mr. Butler and [Petitioner] and another unidentified person. No one seems to be able to, or want to identify this fourth person that was in the car, at least not with any certainty of who it is.

Mr. Clifton says he picked all these individuals up. He was driving the car with Mr. Butler, [Petitioner] and the unidentified person and himself. He says they went to the area where the Corner Bar is and [Petitioner] and the other unidentified male got out and were gone and came back after a short period of time and they had all these purses and wallets and other property, obviously what they had stolen. He said the four of them drove away. The property was later taken by [Petitioner] and the other individual and gone through and thrown out the window at various places along the highway.

That seems to be consistent [with other evidence] because in the days that followed the robbery, the police were getting reports that there were found I.D.s and property scattered along the road, a couple of purses, and they went and collected those items and they certainly were from the victims of the robbery that night.

Eventually, . . . Mr. Butler also agreed to cooperate and gave at least a proffer of what he says

would have occurred, which is consistent somewhat with what Mr. Clifton says in that [Petitioner] and the other unidentified person, who no one seems to know his name, got out and went and committed the robbery and then came back to the car with all the property.

(Id. at 7-10.)

Judge Frye thereafter imposed two consecutive sentences of 82 to 108 months of imprisonment, terms within the presumptive range for Class D felonies. (Docket Entry 10 Ex. 4, Ex. 12 at 20.) Judge Frye also activated Petitioner's prior 22- to 37-month sentence and ordered it to run concurrently with the robbery sentences. (Docket Entry 10 Ex. 12 at 20-21.)

Petitioner did not pursue a direct appeal, but did file two motions for appropriate relief in the state trial court. (Id. Exs. 5, 7.) The state trial court, per Judge Stuart Albright, denied both motions, with the second denial predicated on a procedural bar based on Petitioner's failure to raise his claim(s) in the first motion for appropriate relief. (Id. Exs. 6, 8.) Petitioner sought a writ of certiorari from the North Carolina Court of Appeals, which that court denied. (Id. Ex. 11.) He then filed his instant Petition in this Court. (Docket Entry 6.) Respondent has moved for summary judgment (Docket Entry 9) and Petitioner has responded (Docket Entries 13, 14).

Petitioner's first claim for relief alleges ineffective assistance of counsel in that his attorney had a conflict of interest because she briefly represented Mr. Clifton following his arrest on charges arising from the robberies (and attempted robbery) to which Petitioner pleaded guilty. (Docket Entry 6 at 6;

-4-

Docket Entry 6-2 at 47.)  His second claim asserts ineffective assistance of counsel on grounds that his attorney "misled" and "coerced" him into a "false plea agreement." (Docket Entry 6 at 7.)  For his third claim, Petitioner challenges on double jeopardy grounds the alleged "impermissible double punishments" imposed on his convictions.  (Id. at 9.)  In his fourth claim for relief, Petitioner contends that an inadequate factual basis existed to support his guilty plea.  (Id. at 11.)  Petitioner's fifth claim effectively asserts prosecutorial misconduct.  (Id. at 13.)

## II. Discussion

Federal law precludes habeas relief in cases where a state court has considered a claim on its merits unless the resulting decision:  1) "was contrary to" or involved an "unreasonable application" of clearly established federal law as set out by the United States Supreme Court; or 2) arose from an "unreasonable" determination of the facts.  28 U.S.C. § 2254(d).  A state court decision is "contrary to" Supreme Court authority if it either arrives at "a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that of the Supreme Court. Williams v. Taylor, 529 U.S. 362, 406 (2000).  A state court decision "involves an unreasonable application" of Supreme Court law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407.

-5-

"Unreasonable" does not mean the same thing as "incorrect" or "erroneous." Id. at 409-11. State court findings of fact enjoy a presumption of correctness subject only to rebuttal by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

## A. Claim One

Petitioner's first claim for relief alleges that his attorney operated under a conflict of interest during the time she represented him. (Docket Entry 6 at 6.) As the United States Court of Appeals for the Fourth Circuit has explained:

> It is clearly established federal law that the Sixth Amendment "right to counsel is the right to the effective assistance of counsel." Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (internal quotations omitted). Further, it is clearly established that the right to effective assistance includes the right to representation free from conflicts of interest. [Cuyler v. ]Sullivan, 446 U.S. [335,] 348-50, 100 S.Ct. 1708 [(1980)]; see also Wood v. Georgia, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981); Holloway v. Arkansas, 435 U.S. 475, 489-90, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); Glasser v. United States, 315 U.S. 60, 70, 76, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Lawyers owe their clients a duty of loyalty, including the duty to avoid conflicts of interest. And the Supreme Court has emphasized that the duty of loyalty is "perhaps the most basic of counsel's duties." Strickland, 466 U.S. at 692, 104 S.Ct. 2052.
>
> In order to establish ineffective assistance of counsel in a conflict of interest situation, a defendant who did not raise an objection at trial "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Sullivan, 446 U.S. at 348, 100 S.Ct. 1708. Adverse effect cannot be presumed from the mere existence of a conflict of interest. See Mickens v. Taylor, 122 S.Ct. 1237, 1243-45, 152 L.Ed.2d 291 (2002). The Supreme Court has explained that Sullivan does not require "inquiry into actual conflict as something separate and apart from adverse effect." Id. at 1244 n.5. Rather, "[a]n 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." Id.

-6-

However, _if a defendant shows that a conflict of interest existed and that it adversely affected counsel's performance, prejudice will be presumed_ and the defendant need not demonstrate a reasonable probability that, but for the attorney's conflict of interest, the trial's outcome would have been different. _Sullivan_, 446 U.S. at 349-50, 100 S.Ct. 1708; _see also_ _Mickens_, 122 S.Ct. at 1244-45; _Glasser_, 315 U.S. at 76, 62 S.Ct. 457. This presumption of prejudice arises because "it is difficult to measure the precise effect on the defense" when representation is "corrupted by conflicting interests." _Strickland_, 466 U.S. at 692, 104 S.Ct. 2052; _see also_ _Holloway_, 435 U.S. at 490-91, 98 S.Ct. 1173. When lawyers' conflicts of interest adversely affect their performance, it calls into question the reliability of the proceeding and represents a breakdown in the adversarial process fundamental to our system of justice.

_Rubin v. Gee_, 292 F.3d 396, 401-02 (4th Cir. 2002) (emphasis added).

To show an adverse effect sufficient to support a presumption of prejudice, a petitioner "must satisfy, by a preponderance of the evidence, the three-part standard established in _Mickens v. Taylor_, 240 F.3d 348, 361 (4th Cir. 2001) (en banc), _aff'd without consideration of this point_, 535 U.S. 162 (2002)." _United States v. Nicholson_, 611 F.3d 191, 197 (4th Cir. 2010) (internal parallel citations omitted). Under this test, a petitioner first must "identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued. Second, he must establish that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney . . . . Lastly, he must show that the defense counsel's failure to pursue that strategy or tactic was linked to the conflict." _Id._ (internal block quotation formatting, citations, ellipses, and quotation

marks omitted); <u>accord</u> <u>Stephens v. Branker</u>, 570 F.3d 198, 209 (4th Cir. 2009); <u>Rubin</u>, 292 F.3d at 404.

The state trial court set out the facts associated with Petitioner's conflict of interest claim in its order denying Petitioner's first motion for appropriate relief:

> [O]n or about 19 February 2007 a hearing was held specifically to determine this issue. Apparently, [Petitioner's] attorney was appointed to represent a co-defendant and met with the co-defendant briefly and then immediately withdrew from the co-defendant's case. At the hearing on 19 February, Judge Edgar B. Gregory inquired of [Petitioner] directly about this alleged conflict of interest, and [Petitioner] told Judge Gregory that he did not want his attorney to withdraw from representing him and that [Petitioner] specifically waived any conflict of interest if any existed. [Petitioner] also acknowledged that he thought his attorney had done a great job on his case.
>
> As a result to the hearing, Judge Gregory specifically found in his Order dated 19 February 2007 that [Petitioner's] attorney did not have a conflict, that [Petitioner] waived any potential conflict and that [Petitioner] was satisfied with his attorney's representation. Similarly, at the plea hearing on 17 April 2007, [Petitioner], under oath, told Judge Henry E. Frye, Jr. that he was satisfied with his lawyer's legal services. Judge Frye then specifically found that [Petitioner] was satisfied with his lawyer's legal services.
>
> Even if [Petitioner's] allegations are true regarding an alleged conflict of interest on the part of his attorney, [Petitioner] has made no showing that he suffered any prejudice due to any alleged conflict of interest. Indeed, [Petitioner's] attorney did an outstanding job for [Petitioner] by negotiating a plea that reduced [Petitioner's] exposure from potentially nine consecutive class D sentences to a maximum of two. Additionally, [Petitioner's] attorney was able to negotiate a plea that required his probationary judgment of 23 months minimum to 37 months maximum to run concurrently with the sentence Judge Frye was going to impose.
>
> Based on all of the above findings, the Court finds that [Petitioner's] attorney did not have a conflict of

> interest in representing him at his plea hearing on 17
> April 2007, that even if there was a conflict
> [Petitioner] voluntarily and knowingly waived such
> conflict, and that even if there was a conflict
> [Petitioner] suffered no prejudice as a result.

(Docket Entry 10 Ex. 6 at 1-2.)

In his brief opposing summary judgment, Petitioner offered a two-fold challenge to the foregoing determination. (Docket Entry 14 at 2-6.) First, he contended that Judge Gregory, the judge who held the hearing on the potential conflict of interest, "failed to advise [Petitioner] of the possible conflict and . . . to remove counsel and question her thoroughly as to her feelings on the case . . . ." (Id. at 3.) This argument fails because: 1) the record reflects that, at the conflict hearing, Petitioner received notice (in some detail) of the potential conflict of interest arising from his counsel's brief dual representation of Petitioner and an accomplice and that Petitioner then knowingly and voluntarily waived the identified potential conflict (Docket Entry 10 Ex. 1 at 2-5); and 2) federal law permits such waivers, see, e.g., Gilbert v. Moore, 134 F.3d 642, 653 (4th Cir. 1998) ("To establish in habeas corpus a deprivation of their constitutional right to effective assistance of counsel, Petitioners must show that they did not intentionally, knowingly, and voluntarily relinquish this right. Petitioners have failed to establish that they did not intentionally, knowingly, and voluntarily waive their right to conflict-free counsel." (internal citations omitted)).[1]

---

[1] During the conflict hearing, Petitioner (through his counsel) reported to Judge Gregory that he did not want his counsel removed and that she had "done
(continued...)

In an attempt to evade his waiver, Petitioner presented his second argument, i.e., that the impact of the alleged conflict of interest did not become apparent until after the conflict hearing, when counsel "refused to prepare for trial" and "misled, misinformed, and coerced [Petitioner] into a plea agreement." (Docket Entry 14 at 3-4.) The Fourth Circuit has recognized that sometimes events subsequent to a waiver of conflict-free representation can bring "the particular nature of [a] conflict . . . into sharp focus, [such that] further inquiry should have been made." Hoffman v. Leeke, 903 F.2d 280, 289 (4th Cir. 1990). However, the record reflects no such occurrence in the present case. In other words, Petitioner has failed to show that, after his waiver, his counsel's brief representation of one of his accomplices caused her to forego an objectively plausible strategy or tactic on his behalf, see Nicholson, 611 F.3d at 197.

Petitioner theorizes that, during her brief representation of his accomplice, his counsel "heard and got all the false facts she wanted to hear . . . which clouded [her] performance and outlook to [Petitioner's] defense . . . ." (Docket Entry 14 at 5.) This

---

[1](...continued)
a great job in his case." (Docket Entry 10 Ex. 1 at 4.) When Judge Gregory directly addressed Petitioner about this matter, Petitioner stated that he wanted Judge Gregory to allow his attorney to remain in the case. (Id. at 5.) As a result, Judge Gregory "face[d] the prospect of being 'whip-sawed' by assertions of error no matter which way [he] rule[d]." Wheat v. United States, 486 U.S. 153, 161 (1988). More specifically, as a reward for granting Petitioner's request to keep his attorney, Judge Gregory stands accused of having violated Petitioner's Sixth Amendment right to effective assistance of counsel, but, had he denied Petitioner's request in that regard, Petitioner just as easily could have claimed that Judge Gregory deprived him of his Sixth Amendment right to his counsel of choice. See id. Under these circumstances, the Court should decline to second-guess Judge Gregory's decision to accept Petitioner's waiver.

theory suffers from multiple defects.  First, the record does not establish that Petitioner's attorney did learn the details of the testimony Petitioner's accomplice planned to give during her brief representation of the accomplice; to the contrary, the record reflects that Petitioner's counsel told Judge Gregory that she "spoke to [the accomplice and] . . . when he <u>started</u> talking about the facts of the case" she realized that the charges against both Petitioner and the accomplice arose from the same robberies; as a result, Petitioner's counsel understood that she "would <u>immediately</u> need to withdraw from [the accomplice's] cases . . . and did withdraw from his cases." (Docket Entry 10 Ex. 1 at 2-3 (emphasis added).)  This record material provides no basis for Petitioner's contention that counsel learned of the accomplice's account of events, much less became convinced as to the truthfulness of any such account, as a result of her brief representation of him.

Further, in opposing summary judgment, Petitioner offers only a conclusory allegation that, due to the alleged conflict of interest, his attorney "refuse[d] to prepare for trial" and thereby forced him to take the plea bargain offered by the prosecution instead of going to trial.  (<u>See</u> Docket Entry 14 at 5.)[2] Petitioner does not explain what sort of defense his counsel failed to consider, name any witnesses she neglected to interview who could have helped him, or point to any evidence she overlooked; nor

---

[2] This comment from Petitioner's response brief opposing summary judgment illustrates the wholly conclusory nature of his conflict of interest claim: "Petitioner contends counsel failed to act in his interest so it was obvious she acted in someone else's or her own." (Docket Entry 14 at 5.)

did Petitioner identify what "false facts" his accomplice allegedly gave about the robberies, let alone come forward with any evidence to support his general assertion in this regard. (See id.) Petitioner's affidavits similarly fail to provide adequate specifics relevant to these matters. (See Docket Entry 6 at 18-20; Docket Entry 6-2 at 47-48.)[3]

Finally, Petitioner has not presented any basis for the Court to conclude that his counsel's alleged failure to prepare for trial played any material role in Petitioner's decision to plead guilty. Instead, Petitioner's filings make clear that he accepted the plea bargain because he wanted to limit his sentencing exposure. (See Docket Entry 6-2 at 47 ("I was forced into this plea with the

_____

[3] In all of his filings with the Court, Petitioner offered only two concrete assertions concerning specific matters relevant to the charges against him: 1) that he told his counsel "the business wasn't robbed with armed and dangerous weapons" (Docket Entry 6-2 at 48); and 2) that "there was never a positive I.D. by any of the victims that [Petitioner] was a participate [sic] or who [sic] role was what" (id.). Petitioner, however, has not shown that either of these circumstances gave rise to an objectively plausible defense tactic which his counsel failed to employ because of her brief representation of one of his accomplices. For example, Petitioner has cited no evidence that his counsel neglected to stress the absence of a victim identification of Petitioner as one of the masked robbers in her plea negotiations with the prosecutor or that he wished to go to trial in reliance on that defense theory, despite his identification as one of the masked robbers by two accomplices and the recovery of a distinctive mask (described by the victims) from his vehicle. Similarly, Petitioner has not shown how his counsel plausibly could have capitalized on his uncorroborated claim that the weapons described by the victims were not actually dangerous weapons. Presentation of such a defense would have required Petitioner to testify, at least as to how he knew the true nature of the items displayed by the masked robbers. See State v. Thompson, 297 N.C. 285, 289, 254 S.E.2d 526, 528 (1979) ("When a person perpetrates a robbery by brandishing an instrument which appears to be a firearm, or other dangerous weapon, in the absence of any evidence to the contrary, the law will presume the instrument to be what his conduct represents it to be a firearm or other dangerous weapon."). Petitioner, however, has presented no details about the nature of any testimony he might have given and thus the Court lacks any basis to conclude that the information he gave his counsel supported an objectively, plausible defense that she failed to pursue. Moreover, in the same affidavit in which he referenced his report to his counsel about this issue, Petitioner acknowledged a critical fact that confirms the lack of objective plausibility of any defense predicated on his testimony: "My past record . . . would of course discredit my credibility." (Id.)

threat of possible [sic] receiving 88 yrs. plus."); id. at 48 (asserting that advice that conviction at trial "would send [Petitioner] away for basically life . . . [left him] no option but to succumb to the plea").) Even in his response brief opposing summary judgment, Petitioner did not express a desire for a trial. (See Docket Entry 14 at 10 ("I am willing to pay my dues to society. I just want a fair and just sentence if one at all assuming I am not totally guilty.").)[4]

In sum, Petitioner waived the potential conflict of interest posed by his counsel's brief representation of one of his accomplices and has not shown that his counsel failed to pursue any objectively plausible defense strategy due to any such conflict. The record and the law support the state trial court's decision to reject this same claim in connection with Petitioner's first motion for appropriate relief. Accordingly, this Court should deny Petitioner's instant parallel claim.

## B. Claim Two

Petitioner's second claim for relief expands upon some of the arguments he raised in conjunction with his first claim, in that he asserts that his counsel "misled and misinformed" him and "coerced

---

[4] At the time of Petitioner's guilty plea, his counsel told Judge Frye that "[t]his case has never been one [Petitioner has] planned on taking to trial. He's always intended to take responsibility for what happened and his actions." (Docket Entry 10 Ex. 12 at 13.) When Petitioner addressed Judge Frye thereafter, he did not contradict his counsel, but instead stated: "I apologize to you [Judge Frye] and to everyone I've hurt. I apologize to the District Attorney. I know I've made mistakes . . . I know I was [sic] going to go to prison." (Id. at 17.) When Judge Frye asked Petitioner about his actions, Petitioner agreed that he "[j]ust took a gamble or something, just wanted to do something crazy," that he "didn't think [he] w[as] going to get caught," and that "it didn't dawn on [him] until after [he] got arrested what [he] w[as] facing[.]" (Id. at 18.)

[him] into a false plea agreement." (Docket Entry 6 at 7.) He supports this claim with two affidavits of his own (Docket Entry 6 at 18-19; Docket Entry 6-2 at 47-48), and one each from Tiffany Barnes Harper, Sarah M. Scott, and Natarsha L. Moore (Docket Entry 6-2 at 42-46). (See Docket Entry 6 at 7.) In his response brief opposing summary judgment, Petitioner clarified his instant allegations of ineffective assistance as follows: "Counsel did ill advise, mislead Petitioner to believe [he] was to receive two concurrent sentences of six yrs and ten mths. with max of 9 yrs. which [he] was willing to accept at [sic] the possible fear of getting a life long lengthy sentence." (Docket Entry 14 at 6.)

Petitioner submitted one of his affidavits and the affidavits of Ms. Harper, Ms. Scott, and Ms. Moore to the state trial court in conjunction with his claim of ineffective assistance of counsel in his first motion for appropriate relief. (See Docket Entry 10 Ex. 5 at 24-30.)[5] The state trial court thereafter specifically considered Petitioner's claim that he received ineffective assistance because his attorney "'promised' him that he would receive two concurrent (as opposed to consecutive) sentences of a minimum of 6 years, 10 months and maximum of 8 years, 10 months and . . . 'coerced' [him] to pled [sic] guilty by claiming that if he did not take the plea he could be sentenced to more than 88 years in prison." (Docket Entry 10 Ex. 6 at 3.) After thoroughly

---

[5] Petitioner's second affidavit (which he apparently submitted only to this Court and not to the state trial court) offers no information material to the instant ineffective assistance of counsel claim beyond that in his first affidavit. (Compare Docket Entry 6 at 18-20 with Docket Entry 6-2 at 47-48.)

-14-

reviewing Petitioner's sworn statements in his written plea
agreement and during his guilty plea colloquy, Judge Frye's
findings at the time of the guilty plea, and the affidavits
tendered by Petitioner, the state trial court ruled that
Petitioner's foregoing ineffective assistance of counsel claims
lacked merit. (See id. at 3-7.) Petitioner has not shown that the
state trial court's decision in this regard conflicted with
controlling federal law, involved an unreasonable application of
controlling federal law, or arose from an unreasonable
determination of the underlying facts.

To prove ineffective assistance of counsel in this context,
Petitioner must establish, first, that his attorney's performance
fell below a reasonable standard for defense attorneys and, second,
that he suffered prejudice as a result. See Strickland v.
Washington, 466 U.S. 668 (1984). Unsupported, conclusory
allegations do not entitle Petitioner to even a hearing. See
Nickerson v. Lee, 971 F.2d 1125, 1136 (4th Cir. 1992), abrog'n on
other grounds recog'd, Yeatts v. Angelone, 166 F.3d 255 (4th Cir.
1999). Where, as here, the petitioner entered a guilty plea, "in
order to satisfy the 'prejudice' requirement, the [petitioner] must
show that there is a reasonable probability that, but for counsel's
errors, he would not have pleaded guilty and would have insisted on
going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985).
"Moreover, to obtain relief on this type of claim, a petitioner
must convince the court that a decision to reject the plea bargain
would have been rational under the circumstances." Padilla v.

Kentucky, 130 S. Ct. 1473, 1485 (2010) (citing Roe v. Flores-Ortega, 528 U.S. 470, 480, 486 (2000)). This determination requires an objective assessment of "the likely outcome of a trial had the defendant not pleaded guilty." Meyer v. Branker, 506 F.3d 358, 369 (4th Cir. 2007) (citing Hill, 474 U.S. at 59-60, and Hooper v. Garraghty, 845 F.2d 471, 475 (4th Cir. 1988)).

In addition, as Judge Albright recognized in denying Petitioner's ineffective assistance claims (see Docket Entry 10 Ex. 6 at 4), the Supreme Court has declared that:

> the representations of the defendant, his lawyer, and the prosecutor at [a guilty plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

Blackledge v. Allison, 431 U.S. 63, 73-74 (1977).[6]

---

[6] The Fourth Circuit similarly has emphasized that, on collateral review, courts should not lightly disregard a petitioner's sworn statements made at the time of a guilty plea:

> When Little sought to enter his plea the sentencing judge specifically asked "Have you discussed your case fully with your attorney and are you satisfied with his services?" Little, while under oath, responded in the affirmative. Subsequently, the sentencing judge asked "Any one made any promises or threatened you in any way to cause you to enter this plea?" Little answered "No, sir." Unlike Little, we attach considerable importance to this procedural dialogue. Although Little would now seek to disregard any significance attaching to those statements he made while under oath, we do not view his vows as empty gestures. In the absence of clear and convincing evidence to the contrary, Little must be bound by what he said at the time of his plea.

Little v. Allsbrook, 731 F.2d 238, 239 n.2 (4th Cir. 1984).

In this regard, Judge Albright observed as follows:

> In the written Transcript of Plea [i.e., the written plea agreement] and during the plea hearing on 17 April 2007, [Petitioner] swore under oath that he was aware of the maximum punishment for the crimes charged . . . .

> Additionally, [Petitioner] swore under oath that in exchange for pleading guilty . . . he would be exposed to two class D felonies with a prior record level III, and the sentence (and whether the felonies would run concurrently or consecutively) would be totally in the trial court's discretion. [Petitioner] also swore under oath that in exchange for pleading guilty . . ., an unrelated probationary sentence of 23 months minimum to 37 months for felony assault would be activated and run concurrently with whatever sentence the trial court imposed.

> Further, [Petitioner] swore under oath that no one had made any promises or threatened him in any way to cause him to enter his plea against his wishes, and that he entered his plea of his own free will, fully understanding what he was doing. [Petitioner], again under oath, waived his constitutional rights to a jury trial, to confront and cross examine witnesses against him as well other constitutional rights relating to a jury trial. The [trial court] specifically reviewed the terms and conditions of the plea agreement between [Petitioner] and the State, and asked [Petitioner] if he had any questions about what had just been said to him or about anything else connected with his case. [Petitioner] responded by saying, "No, sir."

> The [trial court] accepted the plea only after finding that . . . [Petitioner] was satisfied with his lawyer, . . . that the plea was the informed choice of [Petitioner] and that [Petitioner's] plea was made freely, voluntarily and understandingly.

(Docket Entry 10 Ex. 6 at 3.) The record confirms that Judge Albright's determination of these facts was not unreasonable. (See id. Ex. 3, Ex. 12 at 3-6.)

Further, in denying Petitioner's first motion for appropriate relief, Judge Albright found:

the affidavits of Ms. Sarah M. Scott and Ms. Natarsha L. Moore not to be reliable in the face of the unambiguous record. Their affidavits state that they were under the impression that [Petitioner] would not be sentenced to more than 10 years in prison. This "claim" by Ms. Scott and Ms. Moore is different from and does not support [Petitioner's] claim that he was "promised" a minimum sentence of 6 years, 10 months to a maximum sentence of 8 years, 10 months. More importantly, Ms. Scott and Ms. Moore were both present for the plea hearing on 17 April 2007. Both were present during the plea colloquy when Judge Frye advised [Petitioner] that he was exposed to two class D felonies and that sentencing for these two class D felonies was in his discretion. They were both also present when [Petitioner] acknowledged, under oath, that no promises had been made to him regarding his plea. Additionally, both Ms. Scott and Ms. Moore were present when [Petitioner's] attorney addressed Judge Frye and again noted that the plea exposed [Petitioner] to two class D felonies. [Petitioner's] attorney then requested that Judge Frye further consolidate [Petitioner's] cases into one sentence.

After the plea colloquy between [Petitioner] and Judge Frye and after [Petitioner's] attorney urged Judge Frye to impose only one sentence, Ms. Scott and Ms. Moore were both allowed to address Judge Frye regarding [Petitioner's] sentence. In contrast to their affidavits, each one acknowledged that the ultimate sentence was in Judge Frye's discretion and made absolutely no mention of what they are now claiming, despite being in a position to do so.

Incredibly, the affidavit of Ms. Tiffany Danielle Barnes Harper, filed by [Petitioner], is actually evidence that directly contradicts [Petitioner's] claim that he was "promised" a sentence of a minimum of 6 years, 10 months to a maximum of 8 years, 10 months. In her affidavit, she claims that on the morning of his plea, [Petitioner's] attorney suggested that he take the open plea instead of going to trial. The unambiguous record shows that [Petitioner] did, in fact, take the open plea to two class D felonies instead of going to trial. Based on the above findings, the record unequivocally demonstrates the sentence was discretionary and in accordance with the Transcript of Plea as set forth above and the witnesses knew it or should have known it.

(Id. Ex. 6 at 5-6 (emphasis added).)  Again, the record precludes any finding that Judge Albright acted unreasonably in reaching the foregoing factual determinations.  (See id. Ex. 12 at 10-17.)[7]

Moreover, in light of the above-quoted language from the Supreme Court in Blackledge, Judge Albright neither ruled in a manner contrary to controlling federal law nor unreasonably applied controlling federal law by refusing to grant Petitioner collateral relief based on his post-plea affidavit contradicting his sworn testimony at the time of his guilty plea and/or based on the affidavits of Ms. Harper, Ms. Scott, and Ms. Moore.

Finally, the state trial court also rejected Petitioner's allegation that he received ineffective assistance of counsel because his attorney "coerced" him to accept the plea bargain that exposed him to sentencing for "two Class D felonies to avoid the possibility of being sentenced to nine consecutive Class D felonies in addition to a consecutive probation[] [revocation] sentence." (Id. Ex. 6 at 6.)  Specifically, Judge Albright ruled that:

> [Petitioner's] attorney [wa]s required to inform [Petitioner] of all potential sentences he could face if he rejected the plea in this case and went to trial. Obviously, if he rejected the plea, [Petitioner] was exposed to nine consecutive class D felonies as well as having a consecutive probation[] [revocation] sentence. Again, [Petitioner's] attorney had an affirmative duty to inform him of the potential punishment if he did not accept the plea, and an affirmative duty to give him legal advice about whether he should accept the plea. Simply because he was "scared" of receiving a sentence of

---

[7] The record also reflects that Petitioner had a chance to speak after his attorney requested that Judge Frye exercise his discretion to impose only one sentence notwithstanding the fact that "the plea expose[d] him to two," but that Petitioner never claimed that he understood the plea to require concurrent terms. (See Docket Entry 10 Ex. 12 at 14, 17-19.)

more than 88 years, which in fact could have happened in this case had [Petitioner] proceeded to trial, is not a basis to void a plea.

His attorney informed him correctly of what the potential sentence could be if [Petitioner] went to trial. It is not ineffective assistance of counsel to correctly inform [Petitioner] of the maximum potential punishment if he rejected the plea and to provide him with legal advice about whether he should take the plea, as his attorney apparently did in this case. . . .

[Petitioner's] attorney did an outstanding job for [Petitioner] by getting nine class D felonies consolidated into 2 counts, and by having his probation[] [revocation] sentence run concurrently with whatever sentence the trial court imposed in [sic] his robbery charges. The record also unambiguously reveals that [Petitioner] was satisfied with his lawyer, knew what he was doing, . . . was not threatened or coerced in any way and entered a knowing, voluntary plea. Therefore, . . . his [claim for] ineffective assistance of counsel [based on coercion by his attorney] is without merit . . . .

(Id.)

Petitioner has provided no grounds for this Court to conclude that the foregoing ruling "was contrary to" or involved an "unreasonable" application of clearly established federal law or arose from an "unreasonable" determination of the facts, 28 U.S.C. § 2254(d). To the contrary, the record supports Judge Albright's factual determinations (see id. Ex. 3, Ex. 12 at 3-6)[8] and his

---

[8] Notably, during the plea colloquy, Judge Frye specifically advised Petitioner that, although each of the nine Class D felonies carried a maximum of 229 months in prison, his "record d[id]n't expose [him] to that, but that's the legal maximum the law can impose." (Docket Entry 10 Ex. 12 at 5.) Even at his record level of III, if convicted at trial, Petitioner faced a maximum possible sentence of 135 months in prison on each of the nine Class D felonies (or a total of more than 100 years). See N.C. Gen. Stat. § 15A-1340.17. Given this exposure and the evidence against him, Petitioner has failed to "show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial," Hill, 474 U.S. at 59, and/or "that a decision to reject the plea bargain would have been rational under the circumstances," Padilla, 130 S. Ct. at 1485. In fact, as discussed in the preceding subsection, see supra, pp. 12-13 & n.4, the record and Petitioner's
(continued...)

-20-

analysis reasonably followed the performance and prejudice formula required by <u>Strickland</u> and its progeny.

## C. Claim Three

Petitioner's third claim for relief alleges that he was subjected to double jeopardy because he received multiple punishments. (Docket Entry 6 at 9.) Petitioner raised this claim in his second motion for appropriate relief and the trial court ruled it procedurally barred based on Petitioner's failure to present it in his first motion for appropriate relief. (Docket Entry 10 Ex. 8.) The procedural bar invoked by the state trial court arises under N.C. Gen. Stat. § 15A-1419, which prohibits claims which a petitioner could have raised in a prior motion for appropriate relief, but did not. Absent cause and prejudice or a miscarriage of justice, a federal court may not collaterally review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule. <u>See</u> <u>Harris v. Reed</u>, 489 U.S. 255, 262 (1989). A procedural rule under which the state court has declined to consider the merits of a petitioner's claims is adequate if state courts regularly or consistently apply it, <u>Johnson v. Mississippi</u>, 486 U.S. 578, 587 (1988), and is independent if it does not "depend . . . on a federal constitutional ruling," <u>Ake v. Oklahoma</u>, 470 U.S. 68, 75 (1985).

---

[8](...continued)
filings in this Court confirm that, throughout the life of his cases in both state and federal court, Petitioner has lacked interest in proceeding to trial.

The Fourth Circuit:

> has consistently held . . . that § 15A-1419 is an adequate and independent state-law ground for decision foreclosing federal habeas review. <u>See Williams v. French</u>, 146 F.3d 203, 208-09 (4th Cir. 1998); <u>Ashe v. Styles</u>, 39 F.3d 80, 87-88 (4th Cir. 1994) (explaining that a federal habeas petition should have been denied on the basis of procedural default because the state court denied relief pursuant to § 15A-1419(a) which is "an adequate and independent state law ground of decision"); <u>see also</u> <u>O'Dell v. Netherland</u>, 95 F.3d 1214, 1241 (4th Cir. 1996) (en banc) (holding that unambiguous procedural rules derived from state statutes or court rules are necessarily "firmly established" (internal quotation marks omitted)), <u>aff'd</u>, 521 U.S. 151, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997) . . . .

<u>Boyd v. French</u>, 147 F.3d 319, 332 (4th Cir. 1998).  Accordingly, unless Petitioner demonstrates either cause and prejudice for his procedural default or establishes that this Court's refusal to address his claim on the grounds of procedural default would result in a miscarriage of justice, this Court may not consider his instant claim.

In his response brief opposing summary judgment, Petitioner states that he "wasn't in adequate position to have raised [this claim] . . . in [his] prior [motion for appropriate relief]." (Docket Entry 14 at 7.)  He also contends that he "has shown cause for his failure to assert the claim in earlier proceedings . . . ." (<u>Id.</u>)  However, Petitioner simply makes these conclusory statements without an explanation that would give them meaning.  As a result, he has not established cause and his claim is barred.

Petitioner also cannot show prejudice.  The United States Constitution prohibits multiple punishments for the same offense. <u>North Carolina v. Pearce</u>, 395 U.S. 711, 717 (1969).  However,

-22-

Petitioner pleaded guilty to robbing eight separate people and attempting to rob another. The state court's imposition of two separate sentences thus did not violate the Constitution. Indeed, as Petitioner's attorney warned him in urging him to plead guilty, he could have received nine separate sentences.[9] Because Petitioner's instant claim also fails if considered on the merits, he neither can show prejudice or a miscarriage of justice sufficient to escape the procedural bar nor secure relief in the absence of the procedural bar. The Court, therefore, should dismiss Petitioner's third claim for relief.

### D. Claim Four

Petitioner's fourth claim for relief alleges that Judge Frye violated his rights under the Fourteenth Amendment by accepting his guilty plea without an adequate factual basis. (Docket Entry 6 at 11.) Petitioner presented this claim in his first motion for appropriate relief and, in rejecting it, Judge Albright stated:

> [T]he Court finds that during his plea hearing on 17 April 2007, [Petitioner] not only pled guilty to the nine criminal charges set forth above, but also admitted under oath that he was, in fact, guilty of all nine criminal charges set forth above. [Petitioner] also admitted, again under oath, that there were sufficient facts to support his plea and consented to a summarization of the evidence relating to the factual basis. When asked if [he] had any questions about his plea and what he had just admitted, [Petitioner] said, "No, sir."

---

[9] Petitioner has failed to cite and the undersigned United States Magistrate Judge has failed to locate any authority to support Petitioner's assertion that his nine offenses constitute "a single offense because the bar [where the robberies occurred] was privately own [sic] where all members had to have membership making [all of the robbery victims] a part of the business." (Docket Entry 14 at 8.)

During the summarization, the assistant district attorney established that not one, but two co-defendants identified [Petitioner] as one of the individuals who committed the nine crimes as set forth above. Also, evidence, including a paint ball mask, obtained from [Petitioner's] motor vehicle pursuant to a search warrant corroborated the victims' description of what one of the robbers was wearing when the crimes were committed.

After the State summarized the evidence against him, Judge Frye again inquired directly of [Petitioner] and [Petitioner] again admitted he did, in fact, commit these crimes. Judge Frye ultimately found that there was a factual basis for entry of the plea. Based on all of the above findings, the Court finds that the evidence summarized by the assistant district attorney coupled with [Petitioner's] admissions was more than enough to establish a factual basis for entry of the plea. Therefore, this claim is also without merit . . . .

(Docket Entry 10 Ex. 6 at 2-3).

The record supports Judge Albright's foregoing factual findings. (See id. Ex. 12 at 4-11, 18-20; see also State v. Joyner, 295 N.C. 55, 63, 243 S.E.2d 367, 373 (1978) (defining elements of robbery with a dangerous weapon as: "(1) the unlawful taking or attempted taking of personal property from another; (2) the possession, use or threatened use of firearms or other dangerous weapon, implement or means; and (3) danger or threat to the life of the victim" (internal quotation marks omitted)).) Moreover, Judge Albright's decision declining to find a federal constitutional violation based on Petitioner's instant claim was neither contrary to, nor an unreasonable application of, federal law. See Edwards v. Garrison, 529 F.2d 1374, 1376 (4th Cir. 1975) (following Tenth Circuit in rejecting collateral attack on state conviction based on alleged lack of factual basis for guilty plea because "there is no constitutional requirement that a state court

establish a factual basis for a guilty plea before entering judgment on the plea"); <u>accord</u> <u>Matthew v. Johnson</u>, 201 F.3d 353, 368 (5th Cir. 2000) (citing decisions, inter alia, from Eighth and Eleventh Circuits); <u>Meyers v. Gillis</u>, 93 F.3d 1147, 1151-52 (3d Cir. 1996) (following rulings, inter alia, from Second, Sixth, Seventh, and Ninth Circuits).

Under these circumstances, the Court should deny Petitioner's fourth claim for relief.

### E. Claim Five

Petitioner's fifth, and final, claim for relief asserts that he suffered "prejudice by [the] prosecutor prosecuting [Petitioner] aggressively violating [his rights under the] 5th and 14th Amendments of the U.S. Constitution." (Docket Entry 6, ¶ 12, Ground Five.) As a basis for this allegation, Petitioner cites: 1) the filing of a motion for joinder as to he and another defendant that did not reference a third defendant; 2) "roles never identified"; 3) "other black male was never identified"; and 4) "prosecution tried to get [Petitioner] to testify on [another defendant] and [the prosecutor] admitted he prosecuted [Petitioner] aggressively." (<u>Id.</u>) In his response brief opposing summary judgment, Petitioner recharacterized the instant claim as asserting "selective prosecution." (Docket Entry 14 at 9.) More specifically, he stated: "I have two co-defendants. Both [are] white males with prior records. Both received lesser sentences to

testify. Actually one was not prosecuted at all and he's the states [sic] primary evidence." (Id.).[10]

The state trial court construed Petitioner's first motion for appropriate relief as raising a claim that "the prosecutor prosecuted him aggressively." (Docket Entry 10 Ex. 6 at 1.) It rejected that claim because Petitioner "offer[red] no facts, evidence or arguments in support of [it]." (Id. at 7.) Petitioner has not shown that the state trial court's decision to deny his "aggressive prosecution" claim was contrary to Supreme Court authority, involved an unreasonable application of such authority, or arose from unreasonable factual determinations. In fact, as the Fourth Circuit has recognized, "[t]he obligation of the prosecutor is to prosecute . . . in an aggressive and professional manner." United States v. Godwin, 272 F.3d 659, 679 (4th Cir. 2001) (emphasis added). Nor do any of the above-quoted circumstances identified by Petitioner as supporting his "aggressive prosecution" claim establish a constitutional violation.

Further, to the extent the Court would allow Petitioner to convert the "aggressive prosecution" claim set out in his Petition (and adjudicated by the state trial court in connection with his first motion for appropriate relief) into the "selective prosecution" claim presented in his response brief opposing summary judgment, Petitioner's description of events actually defeats his claim. To make out a claim for selective prosecution, Petitioner

---

[10] The record does not support Petitioner's assertion that one of his accomplices was not prosecuted. (See Docket Entry 10 Ex. 12 at 10.)

must show "(1) that he has been singled out while others similarly situated have not been prosecuted; and (2) that the decision to prosecute him was invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to exercise his constitutional rights." United States v. Greenwood, 796 F.2d 49, 52 (4th Cir. 1986) (internal quotation marks omitted). Petitioner insinuates that the prosecutor treated him differently from the other identified participants in the robberies based on race. However, as Petitioner's very allegations acknowledge, a critical difference other than race actually accounted for the differential treatment: his accomplices agreed to assist the prosecution, while he did not.

Moreover, the comments of Petitioner's counsel at the guilty plea hearing make clear that Petitioner had the same opportunity to cooperate in exchange for a lesser sentence, but made a tactical decision not to do so: "[Petitioner] was, of course, given the opportunity to give up the names [of his accomplices], but the State didn't have a lot of evidence at that point . . . . My client took a gamble that [the State's case] wouldn't get stronger, and, unfortunately, that gamble didn't pay off." (Docket Entry 10 Ex. 12 at 11.) Nor does anything else in the record support Petitioner's suggestion that race played any part in the prosecution of the case.[11]

---

[11] Petitioner did not clearly present a selective prosecution claim to the state trial court (see Docket Entry 10 Ex. 5); however, Respondent has not raised any procedural bar argument to Petitioner pursuing such a claim in this Court.

Accordingly, the Court should deny Petitioner's fifth claim for relief.

**IT IS THEREFORE RECOMMENDED** that Respondent's Motion for Summary Judgment (Docket Entry 9) be **granted**, that the Habeas Petition (Docket Entry 6) be **denied**, and that Judgment be entered dismissing this action.

                      /s/ L. Patrick Auld
                         **L. Patrick Auld**
             **United States Magistrate Judge**

April 13, 2011